**United States District Court**
For the Northern District of California

1
2
3
4
5                                    **NOT FOR PUBLICATION**

6                       IN THE UNITED STATES DISTRICT COURT

7
                        FOR THE NORTHERN DISTRICT OF CALIFORNIA
8

9   CAROL HILL CASTAGNOLA, et al.,              No.  C 11-05772 JSW

10          Plaintiffs,                         **ORDER GRANTING MOTIONS**
                                                **TO DISMISS, WITH LEAVE TO**
11     v.                                       **AMEND, AND SCHEDULING**
                                                **CASE MANAGEMENT**
12   HEWLETT-PACKARD COMPANY d/b/a              **CONFERENCE**
     SNAPFISH.COM, et al.,
13
            Defendants.
14
15   _____/

16                               **INTRODUCTION**

17          This matter comes before the Court upon consideration of the motions to dismiss filed

18   by Defendants, Hewlett-Packard Company dba Snapfish.com ("HP") and Regent Group, Inc.

19   dba Encore Marketing International ("Regent") (collectively "Defendants").  The Court has

20   carefully considered the parties' papers, relevant legal authority, and the record in this case, and

21   it finds the matter suitable for disposition without oral argument.  *See* N.D. Civ. L.R. 7-1(b).

22   The Court VACATES the hearing scheduled for June 15, 2012, GRANTS the motions to

23   dismiss, and GRANTS Plaintiffs leave to amend.

24                               **BACKGROUND**

25          HP, through Snapfish.com, markets and sells photograph related goods and services.

26   (Second Amended Complaint ("SAC") ¶ 21.)  Plaintiffs, Carol Hill Castagnola ("Ms.

27   Castagnola") and Ronda Maas ("Ms. Maas") (collectively "Plaintiffs"), each purchased

28   products through Snapfish.com.  (*Id. ¶¶* 16-17, 57, 72.)  According to Plaintiffs, HP and Regent

     use the

checkout process to deceive consumers into enrolling in a fee-based membership.  (*Id.* ¶ 4.)

In order to complete a purchase on Snapfish.com, a consumer proceeds through a sequence of check-out screens, the first of which requires a consumer to click on a "Check Out" button, from which he or she is taken to the delivery and coupon page of Snapfish.com.  (*Id.* ¶¶ 24-27.)  After the consumer has selected a delivery method, and applied any coupons to the order, the consumer is invited to click the "continue" button, which takes the consumer to the billing page of Snapfish.com.  (*Id.* ¶¶ 29-31.)  The consumer then enters his or her billing information, is invited to click a "continue" button and, at that point, is directed to the review page of Snapfish.com.  (*Id.* ¶¶ 32-34.)  There, the consumer can either cancel the order or complete the purchase.  If the consumer completes the purchase, he or she clicks a "buy now" button, at which point HP charges the consumer's credit card, or other payment method, and the consumer is taken to the receipt page of Snapfish.com.  (*Id.* ¶¶ 35-37.)

At this stage, Regent enters the picture.  Plaintiffs allege that consumers are directed from the receipt page to a new webpage that looks as if it is it is a continuation of the Snapfish.com website, which instead is operated by Regent (hereinafter the "Regent webpage"). (*Id.* ¶ 40.)  The top of the Regent webpage contains the following language "Snapfish Valuepass℠" and "Claim your $10 $5 off gift code now! *SEE OFFER DETAILS."[1]  The Regent webpage also contains the following language:

Claim your gift code below!

JUST ENTER YOUR EMAIL ADDRESS AND ZIP CODE AS YOUR ELECTRONIC SIGNATURE AND CLICK THE YES BUTTON BELOW TO **ACTIVATE YOUR SNAPFISH VALUEPASS℠ MEMBERSHIP** AS DESCRIBED IN **OFFER DETAILS** ON THIS PAGE.

Email Address [Box]    Zip [Box]

click "yes" to join Snapfish Valuepass℠ and claim your savings!

**I want my $10 gift code now!   [Yes]**

By entering my email address and zip code and clicking the yes button above, I am a [sic] activating my membership in Snapfish Valuepass℠

---

[1]      The Court has attached the Regent webpage, as depicted in the SAC, as an appendix to this Order.

and authorizing Snapfish® to securely send my name, address and credit card information to Snapfish Valuepass℠ in accordance with the OFFER DETAILS on this page.

**ENCORE MARKETING INTERNATIONAL (EMI) IS THE OFFERER AND ADMINISTRATOR OF SNAPFISH VALUEPASS℠, A BRANDED MEMBERSHIP PROGRAM OFFERED TO SNAPFISH® CUSTOMERS.**

(*Id.* ¶¶ 41-44 (emphasis in bold and capitals in original); *see also* Appendix.)

The Offer Details are set forth on the left side of the Regent webpage and provide as follows:

Activate your membership in Snapfish Valuepass℠ to claim your $10 gift code good for your next Snapfish® order and start saving and enjoying all the benefits and access for the next 30 days for just a **$1.95 activation fee** billed by Snapfish Valuepass℠ to the credit card you used today on your Snapfish order.  Please note, by entering your e-mail address and zip code ("Enrollment Details") and clicking the "YES" Button, your Enrollment Details as well as the following information from your most recent Snapfish order will be transmitted securely through PGP and SSL encryption to EMI, the Snapfish Valuepass℠ Administrator, to be stored and to secure and administer your membership: your name, credit card information, billing address, billing telephone number and order ID number.  To continue after the introductory trial period, do nothing and all the great benefits and savings will automatically continue for just **$14.95 per month**, billed by Snapfish Valuepass℠ to the same credit card.  You may cancel at anytime, with no further obligation, just by calling the toll-free number contained in the membership information provided to you.  **And, you keep the $10 Gift Code just for trying Snapfish Valuepass℠ for 30 days.**

(*See* ¶ 44 (emphasis in original); Appendix.)

Once a consumer clicks on the "Yes" button, Regent enrolls the consumer in the Snapfish Valuepass℠ program and charges the consumer a $1.95 activation fee and then $14.95 per month thereafter.  (*Id.* ¶ 51.)  Each of the Plaintiffs purchased products from HP through Snapfish.com, and, when presented with the Regent webpage, "clicked on the 'yes' button ... to enroll in the Snapfish Valuepass program, believing that the program was provided by Snapfish, and believing that there were no payment obligations associated with the program." (*Id.* ¶¶ 66, 81.)  Each of the Plaintiffs also allege that they did not see any disclosures that the Regent webpage was not affiliated with Snapfish.com, that Regent, not Snapfish.com, offered the Snapfish Valuepass℠ program, or that they would be charged for enrolling in the program.  (*Id.* ¶¶ 64, 79.)  Regent charged Ms. Castagnola $14.95 per month,

United States District Court

For the Northern District of California

1    from January 2010 through September 2010, for a total of $134.95.[2]  Regent charged Ms.

2    Maas $14.95 per month, from April 2010 through September 2010, for a total of $89.70.

3          Plaintiffs allege that by the time a consumer is shown the Regent webpage, HP

4    already has transferred their billing information to Regent, and they allege that neither HP

5    nor Regent notified consumers that HP would transfer billing information to Regent.  (*Id.* ¶

6    45.)  Plaintiffs also allege that Regent hides the fact that the Snapfish Valuepass℠ program

7    is a fee based membership.  Plaintiffs also allege that HP and Regent never disclose that

8    Regent will use their billing information to enroll consumers and charge them to participate

9    in the Snapfish Valuepass℠ program.  (*Id.* ¶¶ 27, 31, 34, 37.)

10         Although they acknowledge that this information is disclosed on the Regent webpage,

11   Plaintiffs allege that it is inconspicuous and "in much smaller text than used" to present the

12   offer.  According to Plaintiffs, Regent designed the website to obfuscate this information,

13   and "[a] reasonable consumer viewing the Regent webpage would not understand that he or

14   she will be charged for enrolling in the Snapfish Valuepass program because the payment

15   terms are not clearly or conspicuously disclosed to consumers on the Regent webpage.

16   Rather, a reasonable consumer would believe that Snapfish Valuepass is a free perks

17   program offered by" HP.  (*Id.* ¶¶ 46-51, 53.)

18         Plaintiffs allege that Defendants' conduct violates California's Unfair Competition

19   Law, Business and Professions Code section 17200, *et seq.* (the "UCL claim"), and

20   California's Consumer Legal Remedies Act, Civil Code section 1750, *et seq.* (the "CLRA

21   claim").[3]

22

23         [2]    This figure appears to be a typographical error.  If Ms. Castagnola was
24   charged for nine months, the total would be 134.55.  In addition, Plaintiffs' total figures
     regarding the amounts they were charged do not include the $1.95 activation fee.

25         [3]    On April 30, 2012 and May 11, 2012, the Court issued Orders to Plaintiffs
26   directing them to show cause why this matter should not be dismissed for lack of subject
     matter jurisdiction, because it did not appear that the amount in controversy would satisfy the
27   amount in controversy required by the Class Action Fairness Act.  (Docket Nos. 37, 41.)  In
     response, Plaintiffs filed two responses, a stipulation permitting them to file the Second
28   Amended Complaint, and the Second Amended Complaint, which is now the operative
     pleading.  The parties agree that Defendants' motions apply to the SAC.  (*See* Docket No.
     42.)  The Court has considered Plaintiffs' response to the further order to show cause, and it

4

**ANALYSIS**

**A.      Legal Standard Applicable to a Motion to Dismiss.**

A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the pleadings fail to state a claim upon which relief can be granted.  The complaint is construed in the light most favorable to the non-moving party and all material allegations in the complaint are taken to be true.  *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir. 1986). However, even under the liberal pleading standard of Federal Rule of Civil Procedure 8(a)(2), "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

Pursuant to *Twombly*, a plaintiff must not merely allege conduct that is conceivable but must instead allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S.662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully....  When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).  If the allegations are insufficient to state a claim, a court should grant leave to amend, unless amendment would be futile.  *See, e.g., Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296 (9th Cir. 1990); *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990).

//

//

finds that Plaintiffs have, at this stage, shown that the amount in controversy meets CAFA's jurisdictional minimum.

United States District Court

For the Northern District of California

**B.      The Court Dismisses Plaintiff Maas' Claims, With Leave to Amend.**

Defendants move to dismiss Ms. Maas' claims on the basis that she is a Minnesota resident.  A non-California resident may bring claims under the UCL and the CLRA, if they can allege misconduct that occurs within or emanates from California.  *See Northwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222, 224-25 (1999) (citing *Diamond Multimedia Syst., Inc. v. Superior Court*, 19 Cal. 4th 1036, 1063-64 (1999)); *see also Wang v. OCZ Tech Group., Inc.*, 276 F.R.D. 618, 629-30 (N.D. Cal. 2011); *Morgan v. Harmonix Music Systems, Inc.*, 2009 WL 2031765, *2 (N.D. Cal. July 30, 2009).

Plaintiffs allege that Regent is a Delaware corporation based in Lanham, Maryland, and they allege that HP is a Delaware corporation based in California.  (*Id.* ¶¶ 18-19.) Plaintiffs also allege that HP and Regent "conspired with each other to commit the misconduct" described in the SAC.  (*Id.* ¶ 20.)  Ms. Maas does not specifically allege where she accessed Snapfish.com or the Regent webpage.  (*See* SAC ¶¶ 72-85.)  It is clear, however, that she relies on the fact that HP is headquartered in California to establish the requisite nexus to show that she suffered harm that emanated from California.  (Opp. Br. to HP Mot. at 7:23-8:1.)

In the *Wang* case, the plaintiff alleged that the misleading marketing and advertising materials at issue were "conceived, reviewed, approved or otherwise controlled from [defendant's] headquarters in California."  *Wang*, 276 F.R.D. at 630.  The court concluded that those allegations, taken in combination with the allegation that the defendant's executive office was located in California and that the defendant selected California law to resolve web-based disputes were sufficient to establish the requisite nexus for extra-territorial application of the UCL.  *Id.*

In contrast, in the *Morgan* case, the court dismissed claims under the CLRA and the UCL, because the complaint only alleged that one of the defendants was headquartered in California and failed to otherwise "allege what conduct of the defendants, if any, that violated the CLRA took place in California or how [plaintiff] was injured in California."  *Id.* at *2 & n.5.

The Plaintiffs' allegations in this case are more like those in the *Morgan* case than the allegations in the *Wang* case. Plaintiffs allege that HP is based in California, but they do not include any factual allegations that show that the decision to create the Snapfish Valuepass℠ program or the manner in which it was marketed to consumers emanated from California. Plaintiffs also do not include any allegations that HP had any input on the language used on the Regency webpage. At best, Plaintiffs allege that HP transferred information to Regent, but they do not allege that the transfer of billing information occurred in California. Similarly, there are no specific allegations, other than the purported conspiracy, that Regent took any action in California that harmed Ms. Maas. *See Standfacts Credit Services, Inc. v. Experian Information Solutions, Inc.*, 405 F. Supp. 2d 1141, 1148 (C.D. Cal. 2005) (finding that non-resident plaintiffs could not state a UCL claim against non-resident defendants based on co-conspirator liability).

Accordingly, for these reasons, the Court GRANTS Defendants' motions to dismiss the claims brought by Ms. Maas. Because Plaintiffs may be able to allege facts that would show Ms. Maas was injured by conduct that emanated from California, the Court will grant Plaintiffs leave to amend.

**C.     The Court Dismisses the UCL Claim, With Leave to Amend.**

Defendants also move to dismiss the UCL claim on the basis that Plaintiffs fail to state a claim under the fraudulent, unfair and unlawful prongs. In their opposition, Plaintiffs concede that they have not stated a claim under the unlawful prong. Accordingly, the Court GRANTS Defendants' motions to dismiss the UCL claim on this basis. If Plaintiffs choose to amend, they shall exclude the specific allegations that form the basis of the unlawful prong as set forth in the SAC. HP separately moves to dismiss on the basis that Plaintiffs lack standing to seek injunctive relief and have not alleged facts showing they would be entitled to restitution from HP.

//

//

//

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1.     **Plaintiffs Do Not Allege Facts to Show They Have Standing Under Article III to Seek Injunctive Relief.**

HP moves to dismiss, in part, on the basis that Plaintiffs have not established that they have standing to seek injunctive relief.  Plaintiffs argue that, as to injunctive relief, "an issue remains ripe when the challenged conduct may recur and affect the representative plaintiffs or other members of the class."  (Opp. to HP Mot. at 9:12-14 (citing *Williams v. Alioto*, 549 F.2d 136, 144 (9th Cir. 1977)).  However, HP does not merely argue that the issue is moot.[4]  Rather, HP argues that Plaintiffs lack standing under Article III of the United States constitution to seek injunctive relief.  Moreover, Plaintiffs, however, cannot rely on the prospect of future injury to unnamed class members if they cannot establish they have standing to seek injunctive relief.  *See, e.g., Lewis v. Casey*, 518 U.S. 343, 357 (1996); *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999).

To satisfy the Constitution's standing requirements, a plaintiff must show (1) an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury must be fairly traceable to the challenged action of the defendant; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In addition, "a plaintiff must demonstrate standing separately for each form of relief sought."  *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 185 (2000) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983) (notwithstanding the fact that plaintiff had standing to pursue damages, he lacked standing to pursue injunctive relief)).

When a plaintiff seeks prospective relief, in order to establish standing, he or she must show that there is "a likelihood of future injury."  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (internal quotations and citations omitted); *see also Gest v. Bradbury*,

---

[4]     HP argues that the Snapfish Valuepass℠ program stopped accepting new members in March 2010, such that injunctive relief would be meaningless.  Those facts are not contained in the SAC, and HP does not submit evidence of this fact in support of its motion.  Thus, this argument does not provide a basis on which to grant HP's motion.

United States District Court

For the Northern District of California

443 F.3d 1177, 1181 (9th Cir. 2006) (plaintiff must show that he or she is "realistically threatened by a *repetition* of the violation") (internal citations and quotations omitted, emphasis in original). "Past exposure to illegal conduct does not itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Lujan*, 504 U.S. at 564 (internal quotations omitted).

Here, Plaintiffs do not allege that they intend to purchase products from Snapfish.com in the future or that, if they did, they would seek to participate in the Snapfish Valuepass℠ program. Even if they did include such allegations, however, Plaintiffs now have knowledge of the terms and conditions of the program, know that HP would transfer their billing information to Regent, and know that Regent, rather than HP, administers the program. Thus, the Court concludes they have not alleged facts showing a realistic threat that they would be harmed by Defendants' conduct in the future. *See, e.g., Campion v. Old Republic Home Protection Company, Inc.*, – F. Supp. 2d –, 2012 WL 992104, at \*5-\*9 (S.D. Cal. Mar. 23, 2012) (granting motion for summary judgment); *In re Intel Laptop Battery Litig.*, 2011 WL 7290487, at \*2-\*3 (N.D. Cal. Apr. 7, 2011); *cf. Cattie v. Wal-Mart Stores*, 504 F. Supp. 2d 939, 951 (S.D. Cal. 2007) (noting that plaintiff might not have standing to pursue injunctive relief for CLRA claim, where she was aware of true facts and did not state that she would purchase product in the future).[5]

The Court GRANTS HP's motion to dismiss on this basis.

**2.      Plaintiffs Have Not Alleged Sufficient Facts to Show They Are Entitled to Restitution from HP.**

HP also argues that Plaintiffs have not shown they are entitled to restitution from it, rather than from Regent, because they do not allege that HP took any money from them or that it has possession of the Snapfish Valuepass℠ program fees that Plaintiffs were charged.

---

[5]      Although Plaintiffs may not be able to establish they have Article III standing to seek injunctive relief, that would not necessarily preclude them from establishing statutory standing under the UCL, if the can allege sufficient facts to state a claim. *See In re Intel Laptop Battery Litig.*, 2011 WL 7290487, at \*2 n.8; *Jenkins v. Apple, Inc.*, 2011 WL 2619094 at \*2 (N.D. Cal. July 1, 2011); *Cattie*, 504 F. Supp. 2d at 951.

1    Plaintiffs argue that, although the payments were made to Regent, HP "shared in this

2    revenue." (Opp. Br. to HP Mot. at 8:17-18.) Plaintiffs' argument has support in the law.

3    *See Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1338-1340 (2009); *Ferrington v.*

4    *McAfee, Inc.*, 2010 WL 3910169, at *7-*9 (N.D. Cal. Oct. 5, 2010). However, Plaintiffs do

5    not include facts in the SAC from which it is reasonable to infer that HP received those fees,

6    or some other benefit from Regent, either directly or indirectly. *Ferrington,* 2010 WL

7    3910169, at *8-*9.

8          Thus, the Court GRANTS HP's motion to dismiss on this basis.

9          **2.      Plaintiffs Fail to Allege Facts Sufficient to State a Claim.**

10          Defendants also move to dismiss the UCL claim on the basis that the allegedly

11   deceptive and unfair conduct was disclosed to Plaintiffs. Unfair or fraudulent business

12   practices claims under the UCL or the CLRA are governed by the "reasonable consumer"

13   test. *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (citing *Freeman v.*

14   *Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995)). Under the reasonable consumer standard, a

15   plaintiff must "show that members of the public are likely to be deceived." *Id*. (quotation

16   marks and citations omitted); *see also Bank of the West v. Superior Court*, 12 Cal. 4th 1254,

17   1267 (1992). The phrase "'[l]ikely to deceive' implies more than a mere possibility that the

18   advertisement might conceivably be misunderstood by some few consumers viewing it in an

19   unreasonable manner. Rather, the phrase indicates that the ad is such that it is probable that a

20   significant portion of the general consuming public or of targeted consumers, acting

21   reasonably in the circumstances could be misled." *Lavie v. Proctor & Gamble Co.*, 105 Cal.

22   App. 4th 496, 508 (2003).

23          Generally the question whether a business practice is deceptive is an issue of fact not

24   appropriate for decision on a motion dismiss. However, dismissal of such claims is

25   appropriate where the plaintiff fails to show the likelihood that a reasonable consumer would

26   be deceived. *Freeman*, 68 F.3d at 289-90; *see also Colgan v. Leatherman Tool Group., Inc.*,

27   135 Cal. App. 4th 663, 683 & n.15 (2006); *McKell v. Washington Mut. Inc.*, 142 Cal. App.

28   4th 1457, 1473 (2006).

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Defendants rely on a number of district court cases in which courts have rejected

2  claims similar to those raised here, on the basis that the challenged practices were disclosed

3  to the plaintiffs and, thus, could not have been misleading. *See, e.g., Hager v. Vertrue Inc.*,

4  2011 WL 4501046, at *6 (D. Mass. Sept. 28, 2011) (dismissing unfair competition claim

5  brought under Massachusetts law); *Berry v. Webloyalty.com, Inc.*, 2011 WL 1375665, at *4-

6  *7 (S.D. Cal. Apr. 28, 2011) (dismissing UCL and false advertising claims); *Hook v. Intelius,*

7  *Inc.*, 2011 WL 1196305, at *9-10 (M.D. Ga. Mar. 28, 2011) (dismissing unfair competition

8  claim under Georgia law); *Baxter v. Intelius, Inc.*, 2010 WL 3791487 (C.D. Cal. Sept. 16,

9  2010) (dismissing UCL, CLRA and false advertising claims); *In re Vistaprint Corp.*

10  *Marketing and Sales Practices Litig.*, 2009 WL 2884727, at *4-8 (S.D. Tex. Aug. 31, 2009)

11  (dismissing all claims, including unfair competition claim under Massachusetts law), *aff'd*

12  *sub nom., Bott v. Vistaprint USA, Inc.*, 392 Fed. Appx. 327, 2010 WL 3303692 (5th Cir. Aug.

13  23, 2010).  However, other district courts within the Ninth Circuit have permitted similar

14  claims to go forward. *See, e.g., Keithly v. Intelius, Inc.*, 764 F. Supp. 2d 1257, 1266-1271

15  (W.D. Wash. 2011) (denying motion for judgment on the pleadings as to two of three of

16  defendants' marketing techniques); *Ferrington*, 2010 WL 3910169, at *9-*13; *In re*

17  *Easysaver Rewards Litig.*, 737 F. Supp. 2d 1159, 1171-72 (C.D. Cal. 2010).

18    This case can be distinguished in one key respect from the *Ferrington* and *In re*

19  *Easysaver* cases.  In each of those cases, the plaintiffs disputed both the accuracy and the

20  authenticity of the webpages containing the disclosures submitted by the defendants in

21  support of their motions.  Therefore, the courts declined to take judicial notice of screenshots

22  or to apply the incorporation by reference doctrine. *Ferrington*, 2010 WL 3910169, at *3-

23  *4; *In re Easysaver*, 737 F. Supp. 2d at 1167-70.  Here, by contrast, Plaintiffs incorporate the

24  screenshots of the Defendants' webpages into their SAC.  Thus, Plaintiffs have not disputed

25  the accuracy or the authenticity of the webpage and the disclosures at issue.

26    In the *Keithly* case, the court did consider screenshots provided by the defendants

27  and, relying in part on those screenshots, found that one of the three marketing practices

28  about which the plaintiffs complained was not deceptive as a matter of law. *Keithly*, 764 F.

Supp. 2d at 1261-62, 1269.[6]  In that case, one of the defendants, Intelius, was an on-line information service that offered its customers the ability to purchase, *inter alia*, background checks.  *Id.* at 1262-63.  During the course of the transaction, the defendants subjected customers to various marketing techniques that were "designed to result in the sale of products and/or services other than the one the customer initially sought."  *Id.* at 1263.

One such technique was to offer a reduced price on the service a customer originally ordered, if they purchased an additional service.  The additional service generally was offered before the customer had completed his or her transaction and, in most cases, the defendants did not provide their customers with meaningful disclosures about the service or its price.  The defendants also put the onus on the customer to remove the service or decline the offer.  *Id.* at 1267.  The court also found that, in most cases, the disclosures "were the least conspicuous elements on the page ... and are placed in such a way that a reasonable consumer could skim the page, realizes that the surrounding materials are unimportant to the goal of obtaining a background report, and miss the crucial details" of the additional offer. *Id.*  The court concluded that this scheme "presents a subscription service to the consumer in such a way that a substantial portion of the population *is not even aware that an offer has been made*, much less accepted...."  *Id.* at 1269 (emphasis added).

In some cases, however, the defendants clearly advised a consumer of the price of the additional service at the time a customer was providing their billing information.  "Despite all of the other design and transactional elements that tend[ed] to make the ... offer deceptive, a reasonable consumer could not ignore or skim over the repeated disclosure of the ... monthly cost, especially when it was presented at the moment the consumer was required to authorize the purchase."  *Id.*  Thus, court found that practice was not deceptive as a matter of law.

In this case, Plaintiffs were not presented with the offer of the gift code and the Snapfish Valuepass℠ program until they had completed their order.  Thus, Defendants did

---

[6]       Although the *Keithly* case involved Washington's Consumer Protection Act, the plaintiff was required to show the defendants' practices "had the capacity to deceive a substantial portion of the purchasing public."  *Keithly*, 764 F. Supp. 2d at 1266.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    not try to add this service on to Plaintiffs' order during the check-out process by offering the

2    product they wanted to purchase at a discount.  Therefore, unlike the situation in *Keithly*, it

3    was clear that a new offer was in the making.  Further, in order to enroll in the Snapfish

4    Valuepass℠ program and obtain the gift code, Plaintiffs, like the plaintiffs in *Vistaprint* and

5    unlike the plaintiffs in *Ferrington*, had to proactively enter their email addresses and zip

6    codes.  *Compare Vistaprint*, 2009 WL 2884727, at *5-6, *with Ferrington*, 2010 WL

7    3910169, at 11.  Nor were Plaintiffs were enrolled in the Snapfish Valuepass℠ simply by

8    clicking on a button.

9            This case is also distinguishable from the *Keithly* case in another respect.  In that

10   case, the plaintiffs were purchasing reports from the defendants that could be obtained

11   immediately through the internet.  The defendants also tried to upsell products at the time the

12   plaintiffs were searching for a means to obtain the information they had just purchased.

13   *Keithly*, 764 F. Supp. 2d at 1269-70.  In this case, however, Plaintiffs were already aware that

14   the products they had purchased were going to be delivered to them by means other than the

15   Internet.  Although the Plaintiffs were presented with an offer for a gift code and the

16   Snapfish Valuepass℠ program, the Regent webpage specifically states that there are "offer

17   details" four times.  In addition, immediately below that offer for the gift code, Plaintiffs

18   were advised that by entering their email address and zip code and clicking the "Yes" button,

19   they would be activating a Snapfish Valuepass℠ membership as described in the offer

20   details "on this page."  (SAC ¶ 44; Appendix.)  *See, e.g., Berry*, 2011 WL 1365665, at *5

21   (distinguishing *Keithly* on similar basis); *Baxter*, 2010 WL 3791487, at *4 ("The disclosures

22   combined with affirmative steps for acceptance are sufficient that, as a matter o flaw, the

23   webpage is not deceptive.")

24           Plaintiffs allege that HP and Regent did not clearly disclose the lack of affiliation

25   between Regent and HP, such that it was not clear that Regent - rather than HP - offered the

26   Snapfish Valuepass℠ program.  A review of the screenshots depicted in the SAC support

27   Plaintiffs' allegations that the Regent webpage shares the overall look and feel of

28   Snapfish.com, by using similar colors and fonts.  (*See* SAC ¶ 39 and *compare* SAC ¶¶ 27, 31,

34, 37 *with* ¶ 44.)  The Regent webpage also includes language thanking a consumer for his or her order, and there are no allegations that HP or Regent advised Plaintiffs that they were being directed to a new website.

The Regent webpage also includes language that advises consumers that by entering their email address and zip code and clicking on the "yes" button they are, *inter alia*, "authorizing Snapfish® to securely send [their] name, address, and credit card information to Snapfish Valuepass℠," which could suggest that they were still dealing with Snapfish.com. (SAC ¶ 44; Appendix.)  If this were the only language on the Regent webpage, Plaintiffs' argument might have more force.  The Court, however, cannot look at the statements on the webpage in isolation.  Below the "YES" button is a statement that "Encore Marketing International (EMI) is the offerer and administrator of Snapfish Valuepass℠, a branded membership program offered to Snapfish® customers."  A similar disclosure is set forth on the left side of the Regent webpage.  (SAC ¶ 44; Appendix).  The Regent webpage also has a copyright reference at the bottom of the page which reads "©2011 Encore Marketing International."   The Court finds that any ambiguity about who offers and administers the Snapfish Valuepass℠ program "is dispelled by the [webpage] as a whole."  *Freeman*, 68 F.3d at 290 (evaluating promotional material in its entirety).

Plaintiffs also allege that "[u]benknownst to consumers, by the time they are shown" the Regent webpage, HP "has transferred their billing information (including their credit card numbers and addresses to Regent."  (SAC ¶ 63.)  Even if that was true, and the statement that HP would transfer that information after a consumer entered his or her email address, zip code and clicked the "YES" button was, therefore, false, there are no facts that would support the conclusion that Plaintiffs lost money or property merely because of their information was transferred, rather than used to bill them for unwanted services.

Plaintiffs also allege that Defendants did not clearly disclose that there were payment obligations associated with the Snapfish Valuepass℠ program.  However, the Regent webpage contains four references to the fact that there are "Offer Details."  The "Offer Details" state that Regent would charge Plaintiffs an activation fee of $1.95 and a monthly

United States District Court

For the Northern District of California

1   fee of $14.95.  In the *Freeman* case, the plaintiffs claims were based on sweepstakes

2   mailings, which stated that in order to win, one must submit a winning number.  *Freeman*, 68

3   F.3d at 287-88. The plaintiff in *Freeman* argued that members of the public "would be

4   deceived, since it is likely that the reader will review the large print and ignore the qualifying

5   language in small print." *Id.* at 289.  The court soundly rejected this argument, and stated

6   that the "promotions expressly and repeatedly state the conditions to which must be met in

7   order to win.  None of the qualifying language is hidden or unreadably small.  The qualifying

8   language appears immediately next to the representations it qualifies and no reasonable

9   reader could ignore it." *Id.*; *Cf. Baxter*, 2010 WL 3791487, at *4.

10          In this case, as in the *Freeman* case as well as the *Vistaprint* case, the disclosures at

11  issue were on the same page and in close proximity to the box provided to enter the email

12  and zip code.  Although the text of the offer details are in a smaller font than the font used to

13  promote the fit code, based on the screenshot in the SAC it is not unreadably small.

14  Moreover, the amounts that will be charged are in bold.  (SAC ¶ 44; Appendix).  Notably,

15  Plaintiffs do not contend that the actual language used to describe the "Offer Details" was

16  confusing or misleading.  As with the "affiliation" argument, Plaintiffs focus on the manner

17  in which the information is presented on the Regent webpage.  For example, the "Offer

18  Details" are in a smaller font than the statements "Claim your gift code below!" and "I want

19  my $10 gift code now!"  Again, however, the screenshot shows that the Offer Details are on

20  the same page and in close proximity to these statements**.**

21          Upon review of Plaintiffs' allegations, and considering the fact that the webpages at

22  issue are incorporated by reference into the SAC, the Court finds that the facts of this case

23  are more like the facts presented in *Freeman, Berry, Baxter,* and *Vistaprint*, than like the

24  facts in the *Easysaver* or *Ferrington* cases.  The Court also finds the allegations here to be

25  distinguishable from the practices found to be deceptive in *Keithly*.  Although Plaintiffs

26  argue that the circumstances of this case are such that "a reasonable consumer would not be

27  expected to read the fine print on the webpage before providing his or her email address," the

28  Court finds this argument unpersuasive.  (Opp. Br. to HP Mot. at 6:7-9.)  Simply put, the

United States District Court
For the Northern District of California

1    Court finds apt the *Vistaprint* court's statement that "[a] consumer cannot decline to read

2    clear and easily understandable terms that are provided on the same webpage in close

3    proximity to the location where the consumer indicates his agreement to those terms and then

4    claim that the webpage, which the consumer has failed to read, is deceptive." *Vistaprint*,

5    2009 WL 2884727, at *6.

6         The Court GRANTS the motions to dismiss the UCL claim on this basis as well.

7    **E.      The Court Dismisses the CLRA Claim, With Leave to Amend.**

8         **1.      The Venue Affidavit.**

9         Defendants move to dismiss the CLRA claim on the basis that Plaintiffs failed to file

10   the affidavit required by Civil Code section 1780(d), which provides in pertinent part:

11        In any action subject to this section, concurrently with the filing of the
          complaint, the plaintiff shall file an affidavit stating facts showing that the
12        action has been commenced in a county described in this section as a
          proper place for the trial of the action.  If a plaintiff fails to file the affidavit
13        required by this section, the court shall, upon its own motion or upon
          motion of any party, dismiss the action without prejudice.

14

15        Plaintiffs do not dispute that they did not file an affidavit pursuant to Section 1780(d).

16   They argue, however, that the requirement is procedural and, therefore, does not apply.  The

17   Court finds Plaintiff's argument unpersuasive.  Federal courts have concluded that plaintiffs

18   must comply with Section 1780(d) to state a claim.  *See, e.g., In re Apple & AT&T iPad*

19   *Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1077 (N.D. Cal. 2011)  Indeed, even in

20   the *Easysaver* case, on which Plaintiffs rely, the court determined that the plaintiffs were

21   required to comply with the notice requirements of Section 1780.  *Easysaver*, 737 F. Supp.

22   2d at 1178 (noting that although notice requirement was not jurisdictional, compliance is

23   necessary to state a claim but finding requirement satisfied where plaintiff, who was

24   subsequently dismissed, had filed required affidavit).

25        Accordingly, the GRANTS the motions to dismiss on this basis as well.

26        **2.      The Plaintiffs Fail to Allege Facts Sufficient to State a Claim.**

27        Plaintiffs claims under the CLRA are premised upon the same conduct that support

28   their UCL claims.  The CLRA proscribes certain "unfair methods of competition and unfair

United States District Court

For the Northern District of California

1   or deceptive acts or practices undertaken by any person in a transaction intended to result or

2   which results in the sale or lease of goods or services to any consumer...."  Cal. Civ. Code §

3   1770(a).  For the reasons set forth above, because Plaintiffs have failed to allege facts

4   showing that Defendants' conduct was unfair or deceptive, Plaintiffs also fail to state a claim

5   under the CLRA.

6        Therefore, the Court GRANTS the motions to dismiss on this basis as well.

7                                   **CONCLUSION**

8        For the foregoing reasons, the Court GRANTS the motions to dismiss filed by HP

9   and Regent.  Because the Court cannot say with certainty, that Plaintiffs could not state a

10  claim under the UCL or the CLRA, it shall grant Plaintiffs an opportunity to amend their

11  claims, if they so choose.  Plaintiffs may file an amended complaint by no later than July 6,

12  2012.  The Court sets this matter down for an initial case management conference on Friday,

13  August 31, 2012 at 1:30 p.m.  The parties' Joint Case Management Conference statement

14  shall be due by no later than August 24, 2012.

15       If Plaintiffs choose not to amend, they shall file a notice to that effect by no later than

16  July 6, 2012, after which the Court will enter an order dismissing all claims with prejudice.

17       **IT IS SO ORDERED.**

18

19  Dated: June 13, 2012                                   _____

20                                                          JEFFREY S. WHITE
                                                            UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28